

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00229-CR
No. 02-19-00230-CR
No. 02-19-00231-CR

_____

JONATHAN ANDREW COLLINS, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court Nos. 1541883D, 1541884D, 1541885D

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Jonathan Andrew Collins appeals his convictions for aggravated robbery while using a deadly weapon (a vehicle) and for aggravated assault while using a deadly weapon (a vehicle), both convictions predicated on the State's two-count indictment in trial court cause number 1541883D.[1] In two points, Collins argues (1) that the evidence is insufficient to support that he intended to commit theft or injure the complainant in this case (an element of his aggravated-robbery conviction) and (2) that his aggravated-assault conviction is barred by double jeopardy. Because we hold that the jury had sufficient evidence to find Collins guilty of aggravated robbery but because we agree that his aggravated-assault conviction is barred by double jeopardy, we affirm the trial court's judgment regarding Collins's conviction for aggravated robbery in trial court cause number 1541883D,[2] we reverse his conviction for aggravated assault in trial court cause number 1541883D,[3] and we affirm the trial court's judgments relating to Collins's convictions for evading arrest in

---

[1] Even though these charges as well as charges for evading arrest in trial court cause number 1541884D and assault by threat or contact in trial court cause number 1541885D were tried at the same time before the same jury, Collins does not challenge his convictions for evading arrest and assault by threat or conduct on appeal even though he perfected appeals for each conviction.

[2] *See* Tex. Penal Code Ann. § 29.03.

[3] *See id.* § 22.02(a)(2).

trial court cause number 1541884D[4] and assault by threat or contact in trial court cause number 1541885D.[5]

## II. BACKGROUND

Just before midnight on the night of April 18, 2018, Collins, with his girlfriend Veronica Gallardo as his passenger, drove his truck through the parking lot of a Kroger located on Rufe Snow Drive in Keller (Rufe Snow Kroger) and either struck William Blakeman with his truck or struck the shopping cart Blakeman was using, which in turn knocked Blakeman to the ground. Minutes later, Collins drove his truck through the parking lot of another Kroger located on Keller Parkway (Keller Parkway Kroger) and attempted to strike Austin Lindquist with his truck. Because multiple officers responded to a dispatch regarding Blakeman being struck at the Rufe Snow Kroger by inadvertently going to the Keller Parkway Kroger, officers were able to positively identify Collins's truck as it raced through the Keller Parkway Kroger parking lot. From there, Collins led multiple officers on a car chase, which ultimately ended when Collins drove his truck into a house. In a two-count indictment in trial court cause 1541883D, the State charged Collins with aggravated robbery and aggravated assault. The State also indicted Collins for evading arrest in trial court

---

[4]*See id.* § 38.04(b)(2)(A).

[5]*See id.* § 22.01(a)(2), (a)(3).

3

cause 1541884D and for assault by threat or contact in trial court cause 1541885D. The cases were tried together before a jury.

## A. William Blakeman's Testimony

At trial, Blakeman testified that he went grocery shopping at the Rufe Snow Kroger on April 18, 2018. Blakeman recalled how he had shopped and then headed back to his truck that night when another truck, later identified as being driven by Collins, drove toward Blakeman as he was opening the driver's side door to his own truck. The shopping cart that Blakeman had used in the store was nearby. According to Blakeman, Collins's truck slowed down as it approached, making Blakeman believe that someone he knew was inside. Because of its bright lights, Blakeman could not tell whether he knew who was in the approaching truck. Blakeman said that the next thing he knew he awoke in an ambulance.

By Blakeman's account, he had sustained numerous, painful injuries that night, including damage to his elbows, ankle, and head—he received stitches to his right elbow and multiple staples to the wound on his head. Blakeman stated that he still suffered dizziness at the time of trial, that he still experienced soreness in his ankle, and that he still had scars on his right arm, including his elbow. While Blakeman was on the stand, the State introduced pictures of the injuries Blakeman sustained that night.

Blakeman said that when he observed his truck after returning home from the hospital, he noticed damage on the truck that had not been there before, including his

4

driver's side door being bent. It was Blakeman's belief that the damage to the driver's side door was from him holding it when he was struck. His truck also sustained damage to its rear driver's side door and the truck bed. Blakeman did not remember whether the shopping cart had struck him, and he was unaware whether anything was taken from his truck or person that night.

## B. Patiola Vakauta's Testimony

Patiola Vakauta testified that she was at the Rufe Snow Kroger waiting in her car on the night of April 18, 2018, when she heard "a big, loud noise." As she turned to see what the commotion was, Vakauta saw Blakeman lying on the ground next to his truck. Her car was only two parking spaces away. Vakauta said that after seeing Blakeman on the ground, she got out of her car and went to check on him. Blakeman was breathing but not responding to Vakauta's inquiries whether he was okay, so she dialed 911. By Vakauta's account, as she dialed, a truck that she described as the same truck that had hit Blakeman[6] pulled "back around," and Collins and Gallardo got out, went to Blakeman's truck, and rummaged through the front seat while one of them said "something about finding keys."

---

[6]Even though Vakauta testified that Collins's truck was the vehicle that had hit Blakeman, at other times in her testimony, she said that she only heard the loud noise and did not actually see the truck strike Blakeman. When asked on cross-examination if she had not seen Collins's truck actually hit Blakeman then how could she know that it was Collins's truck that had initially hit Blakeman and then returned, Vakauta said, "That's my memory."

Vakauta said that Gallardo then stepped over Blakeman and tried to grab Vakauta's keys, but she jumped back and told Gallardo that she would not give her the keys. Collins and Gallardo then got back into Collins's truck and drove away. Vakauta memorized the truck's license plate number. While she was on the stand, the State played surveillance video captured that night, and Vakauta pointed out to the jury when she appeared in the footage. Vakauta recalled that she did not initially see a shopping cart but that shortly after she went to check on Blakeman, she saw someone picking up Blakeman's groceries and retrieving a cart.

The State also played Vakauta's 911 call for the jury. In the call, Vakauta told the operator that a small black truck had "hit this guy and then [taken] off." The operator asked Vakauta if she had said that the truck had run someone over, and Vakauta said, "Yes." Vakauta also told the operator that "they" had attempted to find Blakeman's keys and take his truck, but they could not. Vakauta was unable to answer the operator's question of whether she was at the Rufe Snow Kroger or the Keller Parkway Kroger. Vakauta also described how Blakeman was bleeding profusely from his elbow and somewhat from the back of his head.

Vakauta said that early the next morning, police showed her a photo lineup of men but that she picked someone other than Collins. Vakauta was able to pick out Gallardo from a photo lineup, and she said she was "100 percent sure" that it was her.

6

## C. Sergeant Robert Carothers's Testimony

Sergeant Robert Carothers of the Keller Police Department testified that as it neared midnight on the night of April 18, 2018, he was initially dispatched to the Keller Parkway Kroger by mistake. According to Carothers, he soon learned that he should have been dispatched to the Rufe Snow Kroger, so he changed course and drove there to investigate. When Carothers arrived, he saw Blakeman lying on the ground next to a pickup truck and a few other people standing nearby. Carothers spoke with Blakeman, who was bleeding from both elbows, the back of his head, and his left forearm. Carothers said that Blakeman was awake and that paramedics had not yet arrived on scene. By Carothers's account, Blakeman could not recall what had happened.

As the State introduced photographs of Blakeman's truck stationed in the Rufe Snow Kroger parking lot that night, Carothers described to the jury what they were seeing. In some of the photographs, small pools of blood were close to Blakeman's truck in the area where Blakeman was lying when Carothers arrived on scene. Carothers said that his investigation revealed that Blakeman had been struck by a truck. Carothers recalled how there was also a grocery cart some fifty feet away from Blakeman's truck, and the cart contained a portion of the groceries Blakeman had purchased that night. Shortly after Carothers arrived, medical personnel responded to the scene. Carothers stated that the medical responders then drove Blakeman to the hospital via ambulance.

While Carothers remained on scene, he spoke with Vakauta. Vakauta provided Carothers with the out-of-state license place number of Collins's truck.

The State played surveillance video from the Rufe Snow Kroger as Carothers was on the stand. In the video, and as Carothers narrated, Blakeman is seen walking a shopping cart toward his truck, and the lights from the truck flash as Blakeman apparently unlocked his truck using the panel of the passenger door.[7] From there, Blakeman walked around the front of his truck as Collins rapidly drove toward Blakeman. Collins's truck slowed as it got close to Blakeman, but then Collins accelerated, and Blakeman fell to the ground. Blakeman was in a position consistent with the pictured pools of blood the jury had already been shown.

But Collins's truck did not stop after Blakeman fell to the ground. Instead, it continued speeding through the parking lot as it knocked Blakeman's shopping cart forward. Collins's truck then drove over a median as if speeding away, only to rapidly return and stop next to Blakeman's truck. At the same time, Vakauta exited her vehicle, which was only feet from Blakeman's truck. Vakauta walked past her vehicle and over to where Blakeman was on the ground. As she stood there watching, two people exited Collins's truck, approached Blakeman's truck, and each opened doors to Blakeman's truck and appeared to be rummaging through the front seat. One of the

---

[7]Blakeman testified that he had not taken his keys with him into the store; rather, he left them in the console of his truck and utilized the keypad on the truck's door to lock and unlock the truck. Blakeman said that when he uses the keypad, the lights on his truck automatically flash for a moment.

people then walked over to Vakauta, and after pausing briefly, ran back toward Collins's truck, got in the passenger side, and the truck sped away. From there, a few more people arrived.

Because the surveillance video was captured from a camera that was several hundred feet away, the State introduced an enhanced, zoomed-in video, which the State admitted was blurry, that again showed Collins's truck appearing to strike Blakeman as he stood outside his own truck. The rest of the enhanced video was consistent with the first video the State introduced. Carothers averred that the video demonstrated that Collins's truck had struck Blakeman and that Collins had used his truck as a deadly weapon.

According to Carothers, Blakeman's truck had "damage near [its] gas cap, a small dent[,] and some brush marks where [Carothers] believe[d] that [Blakeman had fallen] into the truck after he was struck." Carothers testified that he also saw debris from what he believed came from Collins's truck, but Carothers could not say definitely whether Collins's truck or Blakeman had caused the damage to Blakeman's truck. And Carothers said that he did not know for certain whether Collins's truck struck Blakeman or whether it struck the shopping cart that in turn struck Blakeman, knocking him down, but that it was his opinion that Collins's truck had directly struck Blakeman because the video appeared "to depict that." Carothers also said that it did not appear that either person who exited Collins's truck checked on Blakeman.

9

## D. Elliot Thorpe's Testimony

Paramedic Elliot Thorpe of the Keller Fire Department testified that he received an "[a]uto versus pedestrian" dispatch on April 18, 2018. Thorpe said that he proceeded to the Rufe Snow Kroger and that when he arrived he saw Blakeman on the ground "with some blood around him." Thorpe said that he noted that Blakeman had injuries to both elbows and a head laceration. According to Thorpe, even though Blakeman was conscious and breathing, he was exhibiting signs of "retrograde amnesia," which is the loss of memory due to a head injury. Thorpe stated that, in his experience, an automobile, even moving at slow speed, could cause serious injury or death if it struck a person.

## E. Austin Lindquist's Testimony

Austin Lindquist testified that he was working at a Papa John's around midnight of April 18, 2018, at a location near the Keller Parkway Kroger. Lindquist recalled how he was outside unlocking his vehicle when he heard "screeching" and "odd vehicle noises." Lindquist said that he turned to look and saw Collins's truck driving toward him but that it appeared it was not stopping—Lindquist stepped out of the way just as the truck "T-bone[d]" his own vehicle. According to Lindquist, the truck was so close to hitting him that he could "feel the truck itself on [his] pant leg," and it appeared to him that Collins had purposely attempted to hit him before striking his vehicle. Lindquist said the truck then drove away rapidly, but two police vehicles immediately showed up and pursued the truck.

Lindquist averred that he was able to see that a male was driving, and there was also a female passenger, but he otherwise could not give a better description of the people in the truck. Lindquist said that later, he improperly identified the driver and passenger in police photo lineups. And while Lindquist was on the stand, the State introduced photographs of the area where the crash occurred and the damage to Lindquist's vehicle.

## F. Officer Matthew Wheeler's Testimony

Officer Matthew Wheeler of the Keller Police Department testified that he too was mistakenly dispatched to the Keller Parkway Kroger on April 18, 2018. By Wheeler's account, when he arrived at the store, he did not see anything that resembled the details from the dispatch. Wheeler said that he got out of his vehicle and looked around the parking lot when he suddenly heard "tires squealing." As he turned to see where the sound was coming from, Wheeler noticed a dark pickup truck pulling into the parking lot. Wheeler recalled that the license plate on the truck matched the license place from the dispatch, so he called in this information. According to Wheeler, the truck's arrival time at the Keller Parkway Kroger was consistent with someone who would have driven from the Rufe Snow Kroger shortly after the initial dispatch.

Wheeler said that he then got back in his vehicle to pursue Collins's truck, and he initiated his overhead lights. Wheeler described Collins's driving behavior as

11

erratic, and he stated that the truck was driving all over the "grassy medians" and not on the normal travel lanes of the parking lot.

From there, Collins led Wheeler and two other officers in separate patrol vehicles on a chase through city streets and ultimately into a neighborhood, where Collins's truck eventually crashed through an iron fence, off a six-foot ledge, through another fence, and then into a house. Soon after, Wheeler and the other officers were able to apprehend Collins and Gallardo. While he was on the stand, the State introduced photographs that depicted the route of the pursuit, video from Wheeler's dashcam that showed Wheeler's arrival at the Keller Parkway Kroger and his pursuit of Collins, and photographs of the damage caused to the house and surrounding area after Collins crashed his truck.

## G. Officer Mark Barrett's Testimony

Officer Mark Barrett of the Keller Police Department also testified that he initially responded to the dispatch by driving to the Keller Parkway Kroger. After corresponding with Wheeler, Barrett said that he began to drive toward the Rufe Snow Kroger, but he redirected himself back to the Keller Parkway Kroger once it was confirmed that Collins's truck was now there. Almost immediately, Barrett began to pursue Collins's truck as Collins led the officers on the chase—Barrett said that at times he approached speeds near seventy-five miles per hour attempting to keep up with Collins and that Collins had run a red light during the chase. Much like Wheeler had testified, Barrett said that Collins "came up to a roundabout that he couldn't

12

navigate appropriately, lost control, went over a retaining wall[,] and into a house." Barrett averred that he was present when officers apprehended and arrested Collins and Gallardo. The State played for the jury a dashcam video from Barrett's vehicle depicting Barrett's pursuit of Collins as he attempted to evade police. As the video played, in addition to describing the route taken during the pursuit, Barrett pointed out that Collins was often driving down the wrong side of the road and that he had his lights off the entire time.

## H. Corporal Matt Moore's Testimony

Corporal Matt Moore of the Keller Police Department testified that he was dispatched to the Keller Parkway Kroger as well. Moore said that despite dispatch informing him that there had been an apparent attempted theft where a person was injured by a vehicle, he arrived at the store to find nothing consistent with that information, but he did witness Collins drive his truck into Lindquist's vehicle.

Like Wheeler and Barrett, Moore also took part in the pursuit of Collins. Moore identified Collins at trial as one of the two people officers arrested that night after the pursuit. And like when Wheeler and Barrett testified, the State introduced video from Moore's dashcam depicting the pursuit. The State also introduced pictures that showed damage to the inside of the house that Collins hit.

## I. Timothy Charles Lovett's Testimony

In order to rebut Collins's defensive theory that his truck's brakes were not working correctly on April 18, 2018, the State called Timothy Charles Lovett, a

13

collision reconstruction specialist, as an expert witness. Lovett said that he performed a mechanical inspection on Collins's truck. As the State introduced photographs taken when Lovett performed the inspection, Lovett testified to the photographs' content. Lovett averred that even after the damage Collins's truck sustained from having crashed into the house, the truck's steering was still functional and the brakes on the truck were "functional at normal speeds," which he defined as under fifty miles per hour, but he also concluded that Collins's brakes would not have performed optimally once he got into the higher-end speeds during the officers' pursuit. He did admit, however, that given the state of the brakes, he could see that a sudden stop while driving thirty to thirty-five miles per hour could cause Collins's truck to drift one way or the other. After watching the video of the collision in the Rufe Snow Kroger parking lot and seeing the pictures of the damage to Lindquist's vehicle in the Keller Parkway Kroger parking lot, Lovett determined that the images confirmed his findings. He also said that the damage to Lindquist's vehicle was consistent with being rammed by another vehicle going less than twenty miles per hour.

## J. The Verdict

A jury found Collins guilty of aggravated robbery (Count 1 in trial court cause number 1541883D), aggravated assault (Count 2 in trial court cause number 1541883D), evading arrest (trial court cause number 1541884D), and assault by threat or contact (trial court cause number 1541885D). The trial court assessed punishment at thirty years' incarceration for the aggravated-robbery conviction, fifteen years'

14

incarceration for the aggravated-assault conviction, fifteen years' incarceration for the evading-arrest conviction, and a $100 fine for the assault by threat or contact conviction. The trial court rendered judgments accordingly, and this appeal followed.

## III. DISCUSSION

### A. Sufficiency of the Evidence

In his first point, Collins argues that the evidence is insufficient to support the jury's findings (1) that he intended to commit a theft and (2) that he struck Blakeman with his truck. We disagree.

#### 1. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences

15

are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for

16

that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

## 2. Analysis

Count one of the State's indictment pleaded that Collins had "intentionally or knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, cause[d] bodily injury to another, [Blakeman], by striking him with a[] truck and [Collins] used a deadly weapon, namely a truck, that in the manner of its use or intended use was capable of causing death or serious bodily injury." *See* Tex. Penal Code Ann. § 22.02(a)(2). "In the course of committing theft" means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft. *Id.* § 29.01.

### a. Evidence of Intent to Commit Theft

In part of his first point, Collins challenges the sufficiency of the evidence that he intended to steal Blakeman's truck (the intent-to-commit-theft element of the charged offense). Specifically, Collins argues that the only "snippet" of evidence he intended to commit theft is from Vakauta's testimony that she heard Collins and Gallardo discussing something about keys as they rummaged through Blakeman's truck. Collins categorizes the credibility of Vakauta's testimony as "a conversation that she might have misheard" because of all that was transpiring at the time.

17

But viewing the evidence in a light most favorable to the jury's verdict, the evidence shows that Collins was attempting to steal Blakeman's truck. Indeed, it was the jury's province to believe Vakauta's testimony that she heard Collins and Gallardo discussing keys as they rummaged through Blakeman's truck. *See Queeman*, 520 S.W.3d at 622. Further, the jury had before it other evidence that Collins and Gallardo intended to steal Blakeman's truck. Not only did Vakauta testify that she overheard the couple discussing keys, she also said that Gallardo tried to take her keys. A reasonable deduction from this evidence is that Collins and Gallardo were attempting to obtain a different vehicle than they were driving and that after failing to find Blakeman's keys so that they might steal Blakeman's truck, they resorted to attempting to take Vakauta's vehicle by obtaining her keys.

And Collins and Gallardo's flight from the Rufe Snow Kroger once they were aware that Vakauta was calling the police as well as Collins's ultimate flight of leading police on a car chase demonstrated a consciousness of guilt. *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989) ("Evidence of flight is admissible as a circumstance from which an inference of guilt may be drawn."). Moreover, the jury heard evidence that minutes after the incident at the Rufe Snow Kroger, Collins attempted to strike Lindquist with his truck at the Keller Parkway Kroger. The reasonable inference from this evidence is that because Collins had failed to steal Blakeman's truck, he was then attempting to steal Lindquist's vehicle in a similar fashion. We conclude that a rational factfinder could have found beyond a reasonable doubt that Collins intended

18

to steal Blakeman's truck and thus he intended to commit theft. *See Jenkins*, 493 S.W.3d at 599. We overrule this portion of Collins's first point.

### b. Evidence that Collins Struck Blakeman with Collins's Truck

In the remainder of his first point, Collins argues that the evidence is insufficient to support the jury's finding that he struck Blakeman with his truck. That is, Collins argues that "the overwhelming consensus based on the physical evidence and the videotape in conjunction with the injuries sustained by [Blakeman] indicate that he was hit only by the shopping cart."

Viewing the evidence in a light most favorable to the jury's verdict, the evidence supports the jury's finding that Collins struck Blakeman with his truck. Indeed, as the State points out, the surveillance video from the Rufe Snow Kroger shows that Collins's truck was still jostling Blakeman against Blakeman's truck after the shopping cart had been pushed forward with groceries spilling out of it. Further, Carothers testified that although he did not know for certain whether Collins's truck struck Blakeman or if Collins's truck struck the shopping cart that in turn struck Blakeman, knocking him down, it was his opinion that Collins's truck had directly struck Blakeman because the video appeared "to depict that." Moreover, the jury heard testimony that Collins attempted to strike another person with his truck moments later, demonstrating that Collins was fixated on knocking someone over with his truck in an attempt to steal another vehicle. We conclude that a rational

19

factfinder could have found beyond a reasonable doubt that Collins struck Blakeman with his truck. *See id.*

But even if the evidence conclusively showed that Collins's truck struck the shopping cart and the shopping cart in turn struck Blakeman, the shopping cart would be considered a "further agency employed in the commission of the offense," and the evidence would still support the jury's verdict. *See Fannin v. State*, 168 Tex. Crim. 593, 594, 331 S.W.2d 47, 48 (1960) (holding that aggravated assault based on a collision with an individual by a vehicle may be sustained by proof that a vehicle driven by defendant struck the injured person directly on their body or struck another vehicle causing it to strike the body of the injured person); *Brooks v. State*, No. 05-97-01239-CR, 1998 WL 813400, at *1 (Tex. App.—Dallas Nov. 25, 1998, no pet.) (not designated for publication) ("[T]he State provided . . . sufficient evidence showing that appellant continued to drag the complainant, *using the automobile as his agency*, after he released her arm." (emphasis added)). We overrule the remainder of Collins's first point.

## B. Double Jeopardy

In his second point, Collins argues that his aggravated-assault charge is barred by double jeopardy if this court affirms his conviction for aggravated robbery. *See* U.S. Const. amend. V. The State concedes this point.[8] We agree with both parties.

---

[8]The State's confession of error in a criminal case is important and carries great weight, but it is not binding. *See Saldano v. State*, 70 S.W.3d 873, 884 (Tex. Crim. App.

20

There are three types of double jeopardy claims: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *Garfias v. State*, 424 S.W.3d 54, 58 (Tex. Crim. App. 2014). A multiple-punishments violation can arise either in the context of lesser-included offenses, where the same conduct is punished under a greater and a lesser-included offense, and when the same conduct is punished under two distinct statutes where the Legislature only intended for the conduct to be punished once. *Id.* And when aggravated robbery and aggravated assault are pleaded and the only difference between the allegations is that the aggravated robbery has the additional allegation of theft, aggravated assault is a lesser-included offense of aggravated robbery because "it is established by proof of the same or less than all the facts required to establish the commission of the offense charged," and thus it violates double jeopardy to convict a defendant of both charges. *Ex parte Denton*, 399 S.W.3d 540, 547 (Tex. Crim. App. 2013).

Here, the only difference between the State's allegation of aggravated robbery and the State's allegation of aggravated assault is that the aggravated-robbery allegation has the added allegation that Collins injured Blakeman during a theft. Thus,

---

2002). We are required to independently examine the error confessed because the proper administration of criminal law cannot be left merely to the stipulation of parties. *Id.*; *Rachal v. State*, Nos. 02-18-00500-CR, 02-18-00501-CR, 2019 WL 5996985, at *5 n.3 (Tex. App.—Fort Worth Nov. 14, 2019, no pet.) (mem. op., not designated for publication).

the State's aggravated-assault allegation is a lesser-included offense of its aggravated-robbery allegation. *See id.*

When a defendant is convicted of two offenses that are the same for double-jeopardy purposes, the conviction for the most serious offense is retained, and the other conviction is set aside. *Ex parte Cavazos*, 203 S.W.3d 333, 337 (Tex. Crim. App. 2006). Accordingly, we sustain Collins's second point, retain his conviction for aggravated robbery, and set aside his conviction for aggravated assault. *See id.*

## IV. CONCLUSION

Having overruled Collins's first point but having sustained his second point, we affirm the trial court's judgment regarding Collins's conviction for aggravated robbery (Count 1 in trial court cause number 1541883D), we reverse and vacate his conviction for aggravated assault (Count 2 in trial court cause number 1541883D), and we affirm the trial court's judgments relating to Collins's convictions for evading arrest (trial court cause number 1541884D) and assault by threat or contact (trial court cause number 1541885D). *See* Tex. R. App. P. 43.2(a).

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: April 30, 2020

22